Pearson v. Pilot Travel Centers, LLC, 5180505 Counsel for Appellant, you may proceed. May it please the Court, Counsel. Your Honor, my name is John Cooney. I represent Pilot Travel Centers. This case is about an alleged dangerous condition on a premise. The dangerous condition is a roll of commercial toilet paper balanced on top of a commercial metal door. It has a complete metal door frame, and so the door opens out, so the roll of toilet paper is on the outside of the door facing the bathroom stall. You have to understand that the stall is at the far end of a number of stalls. The plaintiff was the only person in the restroom. These are undisputed facts. As the plaintiff entered the final stall, she opened the door, a roll of toilet paper fell, and hit her on the head. That's the dangerous condition. Those are the operative facts as far as how did this accident occur. As you know, this is a de novo review. We have raised several issues, but three issues in particular that I want to focus on. One is foreseeability. The second is open and obvious. And the third is constructive notice and the lack of a time component, which is required under Illinois law. Let's deal with the first one, foreseeability. I can't think of a situation, if I had to think of a situation, how did this occur? I've never heard of something like this happening before. I don't think anybody else has. I've done a lot of research trying to find falling objects off of a bathroom stall door, and I've been unable to find that. To me, that would be foreseeability. This is an unusual, unique situation. I think it qualifies. Since it's subjective, with your honors, I'm going to move on to my next point, open and obvious. This object was a white toilet paper roll, about 12 inches in diameter, stuck on top of a brown door, 14 inches above the eye level of the plaintiff, and this is all on the record. She says she didn't see it, but it was open because her view was not obstructed by anything, and it was obvious. It was large enough that a person could see it. The fact that she didn't see it, that's another issue, but it was the object itself was open and obvious. And again, I'm going to move on from that. The plaintiff's brief, excuse me, the appellee's brief and the evidence does not answer two questions. The first question I said is, who did this? It makes no sense. It's not something that's a negligent situation because you can't negligently balance a roll of toilet paper on top of a door. That's not something that would fall there. It's not something that – it's an intentional act by somebody to put that roll of toilet paper on top of that door. That being said, who did it, who knows. Plaintiff's expert at trials surmised that it was probably a prank by somebody, but again, that was just surmised. Nobody really knows what happened there. The next question I have, and this is I think the central question to really my argument here today, is a duty does not arise for a landowner or a premises owner until they have reason to believe that there's a dangerous condition on the property. And the biggest component of that is the time component, and there is absolutely nothing in the record to suggest when this object was placed on top of the door, creating the dangerous condition. But did you believe – you don't believe that there was a duty to maintain the – There is a duty to maintain premises, but this is not a maintenance issue. This is like a third-party criminal act case where something different – if this was a situation where we didn't maintain the floors because they had a bomb in them. What about the fact that your employee, Mr. Sales, said that people frequently messed with the toilet paper? Okay, and if you read the – it's in our brief. If you read the entire quote, he's talking about stealing toilet paper or leaving strips of toilet paper on the floor. There's nothing about creating traps or pranks or balancing rolls of toilet paper on top of the door in a dangerous place. That's the difference. Messing with toilet paper is filling up your pockets so you can blow your nose or taking a roll of toilet paper back to your truck. And that's what we can discern from the record? We think somebody stole a roll of toilet paper. No, no. What I'm asking is – and I don't have the full record, but did Mr. Sales say all those things that you just said? No, the only thing he – no, he did say that. He said some of those things. I was embellishing on what other people have said. But he did say – he used the word mess with the toilet paper. But mess with the toilet paper – there's a big stretch between mess with the toilet paper and balancing on top of a door to hit somebody on the head. And that's – I guess that's my distinction there. And, again, the testimony was also that if we had known about this, we would have done something about it. And the issue is when does that duty arise?  And this is such a unique situation that we couldn't have. You're not going to have any knowledge if you don't maintain your restrooms. Well, we do maintain the restrooms. Well, I believe Mr. Sales gave testimony that he basically would go in there and clean if somebody complained and he had not been in there his entire shift. Well, again, there is no duty to maintain. The duty to maintain did not create this – there's no causal connection between that because this was not a lack of maintenance. I think what you're trying to get at is if we had inspected the bathroom, would we have discovered this roll of toilet paper? That wasn't a maintenance issue. That was we didn't discover that this trap had been laid by somebody. And to me, I think that's the distinction. If we had a leaky faucet, I agree with you. If we had a leaking toilet, I agree with you. If there was toilet paper on the floor, I would agree with you. But this was an unused roll of toilet paper balanced on top of a door in a way that just makes no sense. It was such a unique situation. This is not a maintenance issue. Now, failure to inspect, I would agree with you. And that's where the time component comes in because under Illinois law, there is no duty to inspect. The only duty is to – Did they assume a duty by saying that they had a rule that I think it was hourly? They were supposed to – And we've addressed that in our brief. In those cases, our side say there is no duty. You're saying there's no assumption of duty? Is there regulation? The duty arises when we know or should have known that there's a – if there's a potential for a dangerous condition and we don't know the time, then you're right. Again, then you're right. But here's a different situation because we cite the cases and the exceptions are in the cases. For example, there's the case where the employees were using equipment as skateboards and then they knew that people screwed around with this equipment. Messed with it, perhaps. What? Messed with it. Well, this is not messed with. Messed with could mean a lot of different things is what I am inferring. Okay. Messed with the equipment. Messed with the toilet paper. And then he describes specifically what he meant. It's in the record. He basically said steal the toilet paper, throw it on the floor, do vandalism type things. This is a very specific intentional act by somebody. And it's not our employees. It's somebody did this. And that's an unanswered question. The record does not answer. Now, if we had a history of people doing this before, then you're absolutely right. We should be on the lookout for it. Okay. But there is nothing to suggest that anybody has ever done this before at this store or any other store that we operate or any other store that we've ever heard of. Well, I don't think we can consider that. Well, I think that goes to the foreseeability. And I think it's a unique, obvious situation. What was the evidence on that issue on foreseeability? You mentioned that it never happened. Who testified about that? I think plaintiffs asked the manager of the store, and she testified that in her 15 years doing that she had never heard of anything like this. In fact, there had not even been an accident or an injury at our particular store. And that's in the record. Was there any testimony about any other store? How many pilots are there? There's probably 500. I don't know the exact numbers. Was there any evidence in the record about any of them? No. Well, there wasn't any records other than this particular store. All we have is what happened at this store. Right. But the plaintiffs can show foreseeability by showing prior incidents. There were none. Or they can show, you know, similar incidents. There were none. You know, it's not like there's absolutely nothing to suggest this. Okay? In the cases that we cited regarding foreseeability, the Illinois Supreme Court found in situations where there were actually similar prior incidents that there wasn't enough to create foreseeability because the difference between those incidents and the incidents that injured somebody were significant. We don't even have prior incidents that are similar that we can compare this case to. I mean, I'm not aware. Now, there are falling object cases where, you know, store people would store stuff above the head of their customers and that would fall. Okay? I can see that as foreseeability. If we were storing our toilet paper, you know, for some reason on the edges of the bathroom doors or on a shelf above the heads of customers and it fell on the head of a customer, then you would say, okay, well, it's foreseeability that would fall off the shelf and bonk somebody on the head. We don't have that here. This is a completely clean, no place to store anything, you know, I think the testimony was an inch and three quarters. So somebody has to consciously work to balance a roll of toilet paper on a one and three quarter inch edge. And then you have to do it in such a way as it doesn't fall off and they had the door almost completely closed. And all this is in the record. I'm just saying that is a unique situation. You know, it's akin to the third party criminal act cases where you have to have, you know, somebody does something intentional, you know, maybe not to harm somebody, but at least to prank somebody. And then we have to have some sort of knowledge because that happens a lot in the neighborhood or that happens a lot at truck stops or convenience stores or anywhere else to put us on notice that we need to be on the lookout for this. Isn't it also relevant that the plaintiff herself testified that she'd used the same exact restroom stall for eight years and had never in all that time seen a roll of toilet paper balanced on the top edge of the door? Yes. I think that's very relevant. It's also relevant that the traffic that this bathroom sees, you know, this, I think it's in the record, it was in the thousands of the number of people that use that facility, not all of them use the women's room, but a big percentage of them did. In a day, correct? Excuse me? In a day? In a day. Yes. So there's high traffic through here. And given the precarious balancing that's necessary for this object to be on top of this door, and there was actually testimony that this stall, the handicapped stall, was the most popular stall because of obviously the room, that it's the one that gets the most use. So it's this object was not there for very long. How long? There's nothing in the record to suggest that. But what I'm saying is if, for example, you're going back to the inspect, if we had been there an hour earlier, the question is was that object balanced on the door when if we had done the hour inspection, let's say we give it a full 60 minutes, would it have been there? And the answer is we don't know. There is absolutely nothing in the record. And there are cases that say that are based on the exact same fact pattern where there's no dispute as to what the dangerous condition was. There's no dispute that it was in an area that's maintained by the landowner. The only issue is that when does that duty arise? And that duty arises when you know or should have known that that object was there. And that's what we don't have. This is a constructive notice case. That time component is material. You cannot get around it. There are some very clever opinions out there where people have said, okay, now based on these facts we can show that it was there for at least this amount of time. There was a recent case, the Heider case, came out in June, where they had a man sitting at a bar, but he was sitting at that bar for an hour and 40 minutes. And even though they couldn't say exactly when that happened, the testimony was at the trial is that he sat at that bar for an hour and 40 minutes and saw no one enter that bathroom, and therefore the object on the floor had to have been there for at least an hour and 40 minutes. Okay? We don't have that kind of testimony here. Okay? That's the distinction between, and they said the time component is still material. That is material under Illinois law. That is not, the law here is really not in dispute. The only question is, is there something in the record to suggest that this object, was there long enough for us to discover it? And the answer is no. That's pretty much what I have. Thank you, counsel. We'll have an opportunity for another. Thank you, Judge. Counsel, we'll ask the lady. Good morning, Your Honors. May it please the Court. Counsel, my name is Michelle Rich. I represent Riona Pearson, the appellee in this case. This case did proceed to a jury trial in July of last year, right around this time. Christy, my partner, and I both tried it together. We were both trial counsel of record, as was Mr. Cooney and Mr. Zimmerman. I think what's important for you to note here, first and foremost, is the remedy that the defense is asking for. Their entire argument is that their motion for a directed verdict should have been granted, their motion for a judgment notwithstanding the verdict should have been granted. And I know you're all aware of that standard. I've noted it in my brief as well, but I think it's important in this particular case to note that. And what the courts have said, with regard to that standard, is that the court has no right to enter a judgment notwithstanding the verdict if there is any evidence demonstrating substantial factual dispute or where assessment of credibility of witnesses or determination regarding conflicting evidence is decisive to the outcome. And Judge Kolker was absolutely right to deny both of our motions for a directed verdict at the close of evidence. We also moved for a directed verdict on the issue of negligence and res ipsa, and Judge Kolker denied both of those motions, and I think rightly so, because those are issues that the jury decides. Juries decide credibility of the witnesses, conflicting evidence. But isn't the issue of duty de novo review? The issue of duty is de novo review, Your Honor, but I think you also need to keep in mind that there is plenty of evidence to support what the jury decided in this case, and that's what I'd like to talk about. So with regard to... What evidence is there of foreseeability? Foreseeability? Great point, Your Honor, and that's actually one of the first things I wanted to talk to you about. So, Justice Chapman, you raised some points about Mr. Sale's testimony, the janitor, and I'd like to read for you what his testimony was, because I think this goes exactly to the issue of foreseeability and why the jury's verdict is supported by this evidence. So beginning on... This is in the transcript, page 297 of the transcript. I believe it's... I'm not sure what page exactly it is in the record. I can find it for you if you like. But Mr. Sale's is being questioned on the stand at the time of trial, and he says, He's asked... Right. Is that correct? That's not so very much so. That's not true, ma'am, because people take the toilet paper out of the dispenser. But I asked you if everything is going the way it should go, if people are acting normally and not stealing, if pilot protocols are being followed, then the toilet paper wouldn't be accessed by the general public. Is that true? You don't leave it out for the general public to do things with, correct? No, they take it out. Okay, so only if somebody intentionally moved it would it be in the hands of the general public. It's a common fact that the people, well, truck drivers and this and that, the dispensers are, you know, I guess it don't... Toilet paper don't come out as fast as they want it, and they just turn the little handle and take it out and just leave it there. Okay, all right, so you've seen this. Did you say in your 11 years, 11, 12, 11 1⁄2, 11 1⁄2 years at pilot you've seen that the public at times will mess with the toilet paper. Yes, and you're aware of that in your duties as a custodian. Well, yes. And that's something you would check for when you inspect the bathrooms. Of course, of course. And if you saw it on the floor or you saw a roll in the sink or anywhere out of place, you would fix that in your inspection, correct? Well, you would pick the toilet paper up and get it back in the dispenser. Yeah, you put it in one of those three places where it should be, correct? Correct, and as a pilot employee, that's where you would put the toilet paper. That's right. So we have an employee who's testified that he is aware that patrons regularly mess with toilet paper and put it places where it shouldn't be. They open up the dispensers, they take it out. So this is something that is absolutely foreseeable for the defendant in this case. You have testimony that the man does his job. He checks to see if there's toilet paper where it shouldn't be. Right. And if it needs to be replaced, he replaces it. There's also testimony that when they inspected the bathroom immediately after the incident, all the toilet paper rolls were filled and there was nothing unclean or dangerous in the bathroom itself. So how does that, a normal, everyday activity, relate to what amounts to someone's prank of stealing, essentially, a roll of toilet paper that was not located in the women's bathroom because all of them were full, and placing it, taking it from another location, and placing it in the women's stall? I don't understand your reliance on that testimony to prove that they did something, they didn't do something they should have done. Well, first of all, Your Honor, I think that Mr. Sales actually testified he didn't check to see if the toilet paper rolls were all in the dispensers when he went into the bathroom. I think it was someone else who testified when they went, the manager perhaps, when they went in immediately after the incident, all the toilet paper rolls were full. Okay. He testified, and he's the one whose job it is to check, that he didn't actually check for that. So just making that distinction clear there. There's a distinction without difference. I mean, it doesn't matter who checked it. Someone checked immediately after the incident, didn't see any toilet paper out of place. So that clearly indicates that whatever the toilet paper, wherever the toilet paper that hit this person on the head, came from somewhere other than the women's toilet paper dispensers, because they were all full. Well, I think that's a conclusion that you can draw, and the answer is that we don't know where it came from. Well, I guess, as Justice Moore asked, where is the duty to check to see if a roll of toilet paper was smuggled into the women's bathroom and placed in a precarious position as a prank? Your Honor, this goes to the testimony that all of their employees testified to, is that this toilet paper is theirs. It's under their control. They are supposed to maintain control of this toilet paper. And frankly, that is what they did not do, and that's why we alleged a race-ifs account at the time of trial and that jury instruction was given to the jury, is that this is something that they are supposed to maintain control of. It should be in one of three places. And it was allowed to get out of their control, and they did not take the steps to ensure that the toilet paper, which was theirs and their responsibility to maintain and control, stayed within their control and not harm people like my client who were using the restroom. So, and that's another point. In any of the research in this case, has there ever been a case involving harm from a roll of toilet paper before? I mean, if we're talking about a loaded gun, they have a duty to make sure that they know where all the loaded guns in the facility are. But a roll of toilet paper presumably on a janitor's cart in the men's bathroom doorway. It's in the fact that they have policies to make sure that the restrooms are cleaned and maintained. It's their manager, Jamie Abbott's testimony, that yes, she's aware that there are hazardous conditions that can occur in the bathroom, and that's why those policies are so important. And the employees are to inspect that restroom every hour, and it's everybody's job. And they can't point to a single person who was in that restroom in five hours before my client got injured. So that's what they failed to do. They failed to make sure that this was in a reasonably safe condition for my client and other patrons. And the defense is harping on premises liability as kind of the theory here, but we submitted this case based on negligence. We submitted this case based on res ipsa. And I think that the jury instruction on res ipsa is particularly helpful and persuasive in this case and supports the jury's verdict. And that instruction says that we can attempt to prove in either of two ways that Pilot Travel Center was negligent. She may prove either what Pilot Travel Centers actually did or did not do. On the other hand, she may attempt to prove the following propositions, that the injury was received from an industrial-sized roll of toilet paper which was under the defendant's management. Third, that in the normal course of events, the injury would not have occurred if the defendant would have used ordinary care while the industrial-sized roll of toilet paper was under the defendant's management. So those are all theories that we submitted to the jury. The jury rendered a verdict in favor of my client. They got to consider all of this evidence. This is definitely a case where it should have been given to the jury because there is conflicting evidence. We don't know who put this roll of toilet paper there, but what we do know is that if they would have done what they were supposed to do, kept control of their toilet paper, inspected their bathrooms in a timely manner according to their policy, my client's injuries would not have occurred. What would have been the case, what would your argument have been had they inspected it at 9 p.m. on the dot and at 9.02 the perpetrator of this prank went in and did what they did and then your person got injured? I mean, they inspected it, but they, I mean, I don't know. I'm having a hard time finding out how they were supposed to inspect. I mean, as far as the toilet paper, it could be anything in the bathroom that causes a hazardous condition. It could be a brick that was placed up there. But, I mean, they go in, they check, you know, and after the incident and the bathroom is clean, the bathroom doesn't have any hazardous conditions and all the toilet paper rolls are where they're supposed to be. So clearly it was something not expected or anticipated and from everyone's testimony, even your clients, this has never been something that any of them have experienced before. I can tell you if that would have been the case, Your Honor, if they would have proven to me that they had somebody in there in that restroom, you know, pretty close in time to when my client's accident would have occurred, I wouldn't have brought this case. I would not have, absolutely. And I think that's the distinction between some of the cases that they've cited, including that Hayes case that they talked about. The problem here is that, and this is what the jury picked up on, they just cannot show that they did what they were supposed to do in maintaining the restrooms and making sure that they kept control of that toilet paper like they were supposed to. So, no, I would have not brought that case. Absolutely not. Just out of curiosity, and I've probably glossed over it, how much does this little toilet paper weigh approximately? I believe the evidence was 1.7 pounds, which is actually less than I personally thought it would be, just looking at it, because it is quite a sizable roll. I'm not sure if you were given the exemplar roll in evidence or not, but it was about 1.7 pounds. Was there any dispute as to, there were herniated discs involved, is that correct? That's correct, Your Honor. Is there any dispute, was there any testimony proffered by the defendant that there was not a causal connection between the toilet paper fall and the injury? There was not. The defects did not present any medical witnesses. They did not present any evidence that contradicted that my client's injuries were caused by this. That issue is not being appealed, as I understand. Correct, Your Honor. I did not note that in the defendant's brief, but you are correct. How much time do I have? Five minutes. Okay. Would it be okay with you if my co-counsel used the remainder of my time? Thank you. Dr. Sales, testimony. Thanks. I examined Mr. Sales at trial. State your name for the record. I apologize, Your Honor. I have bronchitis, so the reason why I wasn't speaking very much. My name is Christy Cooksey, and I also was trial counsel and representative for Emma Pearson during this case. I do think it's significant to note that Mr. Sales did admit that he was aware that truck drivers not only removed the toilet paper when they were inconvenienced, such as when it didn't come out fast enough, but they also stole it out of need, I don't know. But he also said they tore it up when they were mad. At the exact same time Ms. Pearson entered this bathroom, Mr. Sales was in another bathroom because it was undisputedly a mess. Every employee said that they were aware that these bathrooms, because of the volume, became a mess and in dangerous condition. They were all aware that these toilet paper rolls were allowed to be accessed by the public and in the past had been used in a malicious way in this facility. Because of that, I do believe that this is foreseeable and a duty arises. Is there any other testimony about this malicious streak other than what was read to us? Oh, yeah. As far as what Mr. Sales exactly said, yeah. You seem to be indicating that there's some other testimony. Right there on page 317 in the testimony. It was just about two questions after Ms. Rich left off, which was, that's something you would definitely check for in your inspection of the bathroom. If that was on the floor, in the back, in the sink, and then just the dispenser lying open, you would fix that when you go in and straighten the bathroom. And they also tear it up to just out of sight. That's what he said. That's the kind of things that he saw in his 11 years being in this area. And we've all, in common sense, seen blocked janitorial closets, carts, and the control of the janitor not just left. Dispensers with locks on them. You go to a rest area, you can't open a dispenser and get the toilet paper out. Right? Because that's safe. This was not safe. They were aware that they had an unsafe condition, that these toilet paper rolls could be accessed. And even at the moment of this incident. You keep it. And maybe I'm making this up. Or not making it up. I'm sure you're not. Maybe I'm reading into this further than what you're trying to say. Sure. You keep saying unsafe condition, that the toilet paper created an unsafe condition. The accident that occurred here is not something that would normally be considered unsafe use of toilet paper, if there is such a thing. My understanding of the unsafe condition that toilet paper could cause would be if it were, you know, spewing about on the floor and someone slipped on it. But to have it booby-trapped on the top of a door doesn't necessarily fall under what would normally be considered an unsafe condition in the specific context of toilet paper. Well, and that's one of the questions I asked him, and I was kind of embarrassed on the way up here because I used the word hanky-panky. But one of the questions I asked was, because you're aware that the public, the drivers, the customers will basically intentionally place the hanky-panky with the toilet paper, either steal it or put it, take it out and manipulate the machines. And so he eventually admitted to that. Yes, I was spiked. But that still doesn't amount to using it as a booby-trap. Well, if I couldn't, and I disagree with my co-counsel, I apologize. If I have that testimony, and I knew that this object was in their control, and they knew that these things were happening and didn't take reasonable measures to protect the public from that type of situation, that's a racist case, plain and simple. They have an instrumentality that they realize is being used to cause danger to the public, whether it's on the floor, whether it's on the ceiling. It is a dangerous condition, and that's why they have these policies. And this is their toilet paper. If I took a bowling ball in there and stuck it over the door, we wouldn't be here. This is pilot's toilet paper. That's undisputed. And so can I have any way to tell them, I mean, my client's dazed at this point, to say that the toilet paper was or wasn't in the women's bathroom? I think that's immaterial because it is undisputed. It's theirs. It's undisputed. They know these things happen. It's undisputed. They know it created unsafe conditions in the bathroom, and my client was a victim of that. If there aren't any other questions, I think I'll rest there. Thank you. Thank you for allowing me to speak. We vote. I think we need to keep track of what the dangerous condition here is. It's not the roll of toilet paper. It's the roll of toilet paper balanced on top of the door before somebody can enter a bathroom stall. The combination of those factors creates the dangerous condition. The bathroom stall by itself, the door by itself, the roll of toilet paper by itself, not a dangerous condition. If somebody had been stealing our dynamite or stealing our handguns or stealing our poison, those would be things that we should have a duty to. We never comprehended that people would be injured by our toilet paper. If we had, you know, to pursue their argument, if somebody had been stealing... Other than a rash. Or a rash. That's right. We thought we should use a better grade of toilet paper. But the thing is, if somebody had been taking the roll of toilet paper off the janitor's carts and bonking people on the head and using them as weapons in the parking lot, and we do that, then we should take steps to secure our toilet paper. Toilet paper as a weapon. Toilet paper as an object of a prank had never entered into our way of thinking. And there's nothing in the record that suggests that it did or should have or had done somewhere else. So I'm just going to leave that at that. The object on the floor, that one case, their lead case, the Permanence case, this 1975 Supreme Court case, that was a trip and fall case over an object on the floor. Everybody understands that as a landowner, trips and falls, slips and falls, those are things that we should be paying attention to every single day. Objects falling from the sky or off the tops of doors where they're not supposed to be is not something, until this case, is something that entered into our way of thinking. And that's the distinction. The time, you know, the duty to inspect, the exciting or brief, the life of me cannot remember the names of cases. I think it's the Molesky case versus the hospital. Anyway, that case specifically deals with the same issue that you're talking about, the duty to inspect, the timing, whether or not you have something that you're supposed to do every so often. Again, that was the broken tile case. That case, again, time is a material element of this decision, and we just don't have it. There is nothing in the record to suggest when this prank took place. And if we knew that, then we could assign blame. If we knew we did it, we could assign blame. But there's no evidence that our employees did it. In fact, the weight of the evidence is that we didn't do it, that somebody did this, you know, maybe out of spite, maybe out of anger. We don't know why they did it. We don't know who did it. We don't know when they did it. And because of that, we're asking that this court reverse the trial court and say there was no duty, and therefore this case should never have gone to the jury. Thank you all for your time. Thank you, counsel. The court will take the matter under advisement and issue its decision in due course.